**Hyderally & Associates, P.C.**
33 PLYMOUTH STREET, SUITE 202
MONTCLAIR, NEW JERSEY 07042
TELEPHONE (973) 509-8500
FACSIMILE (973) 509-1770
Attorneys for Plaintiffs

**John J. Zidziunas & Associates, LLC**
33 PLYMOUTH STREET, SUITE 202A
MONTCLAIR, NEW JERSEY 07042
TELEPHONE (973) 509-8500
FACSIMILE (973) 509-1770
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **MICHAEL SANTA LUCIA, FRANK BRUNO, IVAN CASIANO, DANNY BRATTOLI, JOSEPH TRITTO, GABRIEL SCIANNA, and DWAYNE WEBSTER,**<br><br>**PLAINTIFFS,**<br><br>**VS.**<br><br>**MCCLAIN & COMPANY, INC., DANIEL MCCLAIN, ALAN LADD, MATTHEW PASQUALE (IN THEIR PROFESSIONAL AND INDIVIDUAL CAPACITIES), JOHN DOES 1-10, AND XYZ CORP. 1-10,**<br><br>**DEFENDANTS.** | **Civil Action No.: 2:11-11-cv-930(CCC)(JAD) (Lead Consolidated Docket)**<br><br>**Matter Consolidated with**<br>**Civil Action No.: 2:11-cv-00931 (CCC)(JAD)**<br><br><br>**THIRD AMENDED COMPLAINT AND JURY DEMAND** |

Plaintiffs, Michael Santa Lucia ("Santa Lucia"), Frank Bruno ("Bruno"), Ivan Casiano ("Casiano"), Danny Brattoli ("Brattoli"), Joseph Tritto ("Tritto"), Gabriel Scianna ("Scianna"), and Dwayne Webster ("Webster"), (hereinafter collectively the "Plaintiffs"), by way of this Complaint against the Defendants, McClain & Company, Inc., ("McClain"), Daniel McClain ("Dan McClain"), Alan Ladd ("Ladd"), Mark Carucci ("Carucci"), Matthew Pasquale ("Pasquale"), in their individual and professional capacities, John Does 1-10, and XYZ Corp. 1-10 (hereinafter collectively the "Defendants") hereby says:

## I. Nature of Action, Jurisdiction, and Venue

1.  This is an action seeking equitable and legal relief for: (1) a violation of the New Jersey Wage and Hour Law, N.J.S.A. 34:11-56a *et seq*. ("Wage and Hour Law"); (2) New Jersey Wage Payment Act, N.J.S.A. 34:11-4.1, *et seq.*; (3) Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201, *et seq*. ("FLSA"); (4) Conscientious Employee Protection Act, N.J.S.A. 34:19-1 *et seq*. ("CEPA"); (5) breach of express contract; (6) breach of implied contract; and (7) breach of the implied covenant of good faith and fair dealing.

2.  This court has jurisdiction due to the nature of the action and the amount in controversy. Additionally, Plaintiffs have satisfied all prerequisites to bringing these claims.

3.  Venue is appropriate in this court since Defendants work in and have an office and do business in Bergen County, New Jersey; Plaintiffs worked in Bergen County, New Jersey; and some of the causes of action accrued in Bergen County, New Jersey.

## II. Parties

4.  During the relevant time period, Santa Lucia was a Traffic Control Technician ("TCT"), employed by McClain, located at 518 Stuyvesant Street, Lyndhurst, New Jersey 07071, with its corporate offices located at 19152 Germanna Avenue, Culpepper, Virginia 22071.

5.  During the relevant time period, Bruno was a team leader/operator, employed by McClain, located at 518 Stuyvesant Street, Lyndhurst, New Jersey 07071, with its corporate offices located at 19152 Germanna Avenue, Culpepper, Virginia 22071.

6.  During the relevant time period, Casiano was a TCT, employed by McClain, located at 518 Stuyvesant Street, Lyndhurst, New Jersey 07071, with its corporate offices located at 19152 Germanna Avenue, Culpepper, Virginia 22071.

7.  During the relevant time period, Brattoli was a TCT, employed by McClain, located at 518 Stuyvesant Street, Lyndhurst, New Jersey 07071, with its corporate offices located at 19152 Germanna Avenue, Culpepper, Virginia 22071.

8.  During the relevant time period, Tritto was a TCT, employed by McClain, located at 518 Stuyvesant Street, Lyndhurst, New Jersey 07071, with its corporate offices located at 19152 Germanna Avenue, Culpepper, Virginia 22071.

9.  During the relevant time period, Scianna was a TCT, employed by McClain, located at 518 Stuyvesant Street, Lyndhurst, New Jersey 07071, with its corporate offices located at 19152 Germanna Avenue, Culpepper, Virginia 22071.

10. During the relevant time period, Webster was a TCT, employed by McClain, located at 518 Stuyvesant Street, Lyndhurst, New Jersey 07071, with its corporate offices located at 19152 Germanna Avenue, Culpepper, Virginia 22071.

11. During the relevant time period, Dan McClain was the owner and president of McClain.

12. Thus, during the relevant time period, Dan McClain was a senior management level employee who controlled Plaintiffs' workplace and supervised Plaintiffs and aided and/or abetted in the commission of conduct complained of herein.

13. During the relevant time period, Ladd was the Yard Supervisor for McClain.

14. Thus, during the relevant time period, Ladd was a senior management level employee who controlled Plaintiffs' workplace and supervised Plaintiffs and aided and/or abetted in the commission of conduct complained of herein.

15. During the relevant time period, Pasquale was the Regional Manager for McClain.

16. Thus, during the relevant time period, Pasquale was a senior management level employee who controlled Plaintiffs' workplace and supervised Plaintiffs and aided and/or abetted in the commission of conduct complained of herein.

17. During the relevant time period, Carucci was the Regional Director of McClain.

18. Thus, during the relevant time period, Carucci was a senior management level employee who controlled Plaintiffs' workplace and supervised Plaintiffs and aided and/or abetted in the commission of conduct complained of herein.

19. During the relevant time period, JOHN DOES 1-10 are currently unknown employees who were either senior management level employees who controlled Plaintiffs' workplace, and supervised Plaintiffs and aided and/or abetted in the commission of conduct complained of herein and/or who either acted within the scope of their employment at the workplace during working hours, or, to the extent they went beyond the scope of their employment, Defendants ratified, embraced and added to his conduct. As the parties engage in discovery, Plaintiffs retain the right to amend the Complaint to add these individual employees by name.

20. During the relevant time period, XYZ Corp. 1-10 are unknown affiliated corporations or entities or other corporations who have liability for the claims set forth herein. As

the parties engage in discovery, Plaintiffs retain the right to amend the Complaint to add these individual entities by name.

21. Thus, all Defendants are subject to suit under the statutes alleged above.

22. At all times referred to in this Complaint, employees of the corporate Defendants, who are referred to herein, were acting within the scope of their employment at the workplace during working hours, or, to the extent that they were not so acting, the corporate Defendants ratified, embraced and added to their conduct.

### III. Factual Allegations
#### *Michael Santa Lucia*

23. Santa Lucia began working for McClain as a TCT in or around August 17, 2007.

24. During his employment at McClain, Santa Lucia's base salary started at $16.00 per hour.

25. In 2008, Santa Lucia's salary was increased to approximately $17.00 per hour.

26. From January 2009 to May 2009, Santa Lucia's salary was increased to $21.00 per hour as he served as a Project Manager.

27. During his employment as a Project Manager, Santa Lucia objected to the practices of other managers out of the Lyndhurst location and realized he would make more income as a TCT, compared to being a Project Manager.

28. Thus, in May 2009, Santa Lucia requested to go back to working as a TCT and his salary was modified to $18.00 per hour.

29. During the relevant time, Santa Lucia worked on several state government contracts in New York and New Jersey.

30. Every TCT, including Santa Lucia, was required to show up a half hour before their shift began, at the New Jersey location, for a pre-trip inspection which included checking the truck fluids, loading the truck, and generally, preparing for the job.

31. Additionally, every TCT, including Santa Lucia, was required to work a half hour after their shift ended, at the New Jersey location, for a post-trip inspection which included unloading and checking the truck.

32. Despite this fact, Defendants failed to pay Santa Lucia his wages for this pre-trip inspection or post-trip inspection.

33. Additionally, Defendants failed to pay Santa Lucia for his lunch hour, overtime, and appropriate wages.

34. For example, despite the fact that Santa Lucia would often work ten to twelve hour days, Defendants would pay Santa Lucia for only seven or eight hours of work.

35. Santa Lucia protested the pay practices of Defendants in numerous conversations with management at the New Jersey location.

36. While at the New Jersey location, Santa Lucia informed Ladd and Pasquale that it was illegal to not pay employees for the hours they were working.

37. However, Defendants failed to take remedial action.

38. Defendants' actions to violate the wage laws were intentional as demonstrated by a 2009 memorandum.

39. In approximately March 2009, Defendants posted a memorandum, at the Lyndhurst work location, detailing a compensation plan for employees.

40. The memorandum indicated the pay for work on state government contracts, during the day, inside the five boroughs of New York City, would be four hours at prevailing wage, and three hours at base pay.

41. The memorandum indicated the pay for work on state government contracts, during night hours, within the five boroughs of New York City, would be five hours at prevailing wage, and three hours at base pay.

42. The memorandum indicated the pay for work on state government contracts inside of Suffolk and Nassau Counties, would be five hours at prevailing wage, and three hours at base pay.

43. The memorandum indicated the pay for work on state government contracts inside Westchester County would be hourly at prevailing wage, minus a half hour for lunch.

44. Santa Lucia refused to sign the memorandum as it did not comport with the prevailing wage law and it was not consistent with the realities of his work day.

45. Santa Lucia had subsequent discussions, complaining about the company's pay practices, with Ladd and other managers, in the New Jersey location, who refused to take curative action.

46. These managers engaged in numerous actions to demean and marginalize Santa Lucia and other truck drivers who worked out of the New Jersey location.

47. Ladd's lack of respect for employees of McClain was further demonstrated in various memoranda that he distributed for employees.

48. On July 21, 2010, Santa Lucia approached Ladd and informed him, with words to the effect, that he was sick and tired of the company's practice of not paying workers fair wages and prevailing wages.

49. Santa Lucia informed Ladd, with words to the effect, that it was not fair that drivers were working 10-12 hour days and not getting paid fair wages for the work they were performing.

50. Ladd responded by stating, words to the effect, that he was lucky to have a job and the company was sick and tired of crybabies.

51. Santa Lucia got even more upset when he heard such a pejorative response that he informed Ladd that he was going to the labor board to make a formal complaint due to the company's practices of violating prevailing wage laws and the company's treatment of violating the wage laws for the drivers.

52. Ladd informed Santa Lucia that he was being ridiculous and told him to shut up.

53. Santa Lucia stated words to the effect that it was wrong what the company was doing and it was not the right way to treat employees. Santa Lucia advised that he had printed out documentation about New Jersey prevailing wage law and discussed it and showed it to many of the drivers.

54. At that point, Ladd stated words to the effect that he had heard enough, that the conversation was over and that he would discuss it up the chain of command.

55. Ladd reported directly to Pasquale, who reported directly to Dan McClain, the Owner of the company.

56. The next day, Joseph Ferrer ("Ferrer"), Project Manager in the Lyndhurst, New Jersey work location, contacted Santa Lucia and informed him that he was taken off the schedule and his shift cancelled.

57. On July 22, 2010, Santa Lucia did not get notice to work the next day.

58. On approximately Monday, July 26, 2010, Santa Lucia was advised that Defendants began paying employees in compliance with the wage laws.

59. On Friday July 30, 2010, Santa Lucia received a text message from Ferrer who reported directly to Pasquale.

60. Ferrer sent the following text messages to Santa Lucia: "Matt was supposed to talk to you but wasn't able to this week. But you need to hand in your phone, and credit cards."

61. Ferrer then sent another text message to Santa Lucia: "Don't forget to drop off ur mcclain stuff. Al says he will be in da yard all weekend."

62. Santa Lucia could not believe that Defendants would engage in such a blatant act of retaliation and terminate him for threatening to file a formal complaint with the labor board.

63. Thus, he responded and asked, "You gonna tell me why I got fired."

64. Ferrer responded with the following text messages: "According to ur paperwork da day u worked wit cupcake u put u finished at 505. Cupcake weekly states he was workin in yard @ 430. So it would be consider…" "…ed stealing time. Dan said its immdiate termination. Also on da same day when u returned dat day ur ab solar panel was missing and fr…" "…ame was damage. Not …" "… on post-trip dvr as per Al. Ur truck was found dead on empty and must be fueled up at da each day as per AL. Matt was supposed to call u in and explain." "Just contact Matt. Just tellin u what was told to me." "Matt was supposed to talk to you but wasn't able to this week. But you need to hand in your phone, and credit cards."

65. Defendants' reasons for termination are completely pretextual.

66. Jonathan DiCapua, the employee known as "Cupcake" was working until 5:05pm on July 20, 2010.  Cupcake approached David DeCarlo, TCT, and admitted that Ladd directed Cupcake to write down 4:30pm, despite the fact that he worked after 5pm. Further, Santa Lucia had no reason or benefit to fill out paperwork giving Cupcake an additional $8.00 of pay.

67. On July 21, 2010, when Santa Lucia dropped off his truck, the arrowboard was not damaged and the solar panel was not missing.  Further, company protocol requires that Defendants issue a written warning to the driver on the same day that a vehicle is damaged.

68. Throughout his three (3) years of employment, Santa Lucia received no write ups, reprimands, suspensions, criticisms, or discipline.

69. On July 21, 2010, when Santa Lucia dropped off his truck, the gas tank was full.

70. Corporate policy mandates that a driver should fill a truck up prior to the commencement of the shift if the tank was at or below approximately a quarter full. Further, trucks are assigned to particular drivers.  Thus, Santa Lucia would not be able to perform his work duties without gas in his truck. If Santa Lucia had not fulfilled this obligation, corporate protocol required that management write him up the same day of the incident.

71. As stated above, Santa Lucia received no notice of any performance issues until he received text messages from Ferrer.

72. Further, corporate policy mandates that three write ups equates to a termination.

73. McClain is a national multi-million dollar company with over one hundred employees.  McClain has a handbook, detailed corporate policies, progressive

discipline policies, mandatory write up procedures, and numerous other written protocols.

74. In three years of unblemished employment, Defendants promoted Santa Lucia, commended his work performance, gave him salary increases, commended him in conversations with other drivers, and gave him no write ups.

75. The only criticism Santa Lucia received was in text messages from a Project Manager with references to Ladd and Pasquale – days after Santa Lucia threatened to file a formal complaint with the labor board due to the illegal actions of Defendants as it pertained to truck drivers out of the New Jersey location.

76. Defendants' actions to not pay proper wages were intentional.

77. In 2007, Defendants failed to pay Santa Lucia for his thirty minute lunch break in 2007 which amounts to approximately $442 in lost pay (approximately 26 hours x $17).

78. In 2008, Defendants failed to pay Santa Lucia for approximately 83 hours of pre-trip inspections that he worked.   At $18.00 per hour, damages thus approximate $1,494.00.

79.  In 2008, Defendants failed to pay Santa Lucia for approximately 83 hours of post-trip inspections that he worked.   At $18.00 per hour, damages thus approximate $1,494.00.

80. In 2008, Defendants failed to pay Santa Lucia for approximately 15 hours of overtime that he worked.  At $27.00 per hour, damages thus approximate $405.00.

81. In 2008, Defendants failed to pay Santa Lucia for approximately 27 hours of his paid lunch break during his prevailing wage jobs.  At $61.01, damages thus approximate $1,647.21.

82. In 2008, Defendants failed to pay Santa Lucia for approximately 39.5 hours of his paid lunch break during his non-prevailing wage jobs.   At $18.00, damages approximate $711.00.

83. In 2008, Defendants wrongfully deducted approximately 39.5 hours of wages at $2.06/hour for insurance costs.  Thus, damages approximate $81.37.

84. Thus, total unpaid wages, without factoring liquidated and other damages for 2008 approximates $5,833.67.

85. In 2009, Defendants failed to pay Santa Lucia for approximately 112 hours of pre-trip inspections that he worked. At $18.00 per hour, damages thus approximate $2,016.00.

86. In 2009, Defendants failed to pay Santa Lucia for approximately 112 hours of post-trip inspections that he worked. At $18.00 per hour, damages thus approximate $2,016.00.

87. In 2009, Defendants failed to pay Santa Lucia for approximately 100 hours of overtime that he worked. At $26.00 per hour, damages thus approximate $2,600.00.

88. In 2009, Defendants failed to pay Santa Lucia for 21.5 hours of his paid lunch break during non-prevailing wage jobs. At $18.00 per hour, damages thus approximate $387.00.

89. In 2009, Defendants failed to properly pay Santa Lucia for over 162 shifts of prevailing wage work at $125.00 per shift. This includes the mandatory increase of 15% during work on prevailing wage night jobs, the $2.06 unilateral insurance deduction by McClain, the unilateral deduction for lunch during each shift, and the unpaid hours of prevailing wage work while Santa Lucia remained on site. Damages thus approximate $20,250.00.

90. Thus, total unpaid wages, without factoring liquidated and other damages for 2009 approximates $27,269.00.

91. In 2010, Defendants failed to pay Santa Lucia for approximately 58.5 hours of pre-trip inspections that he worked. At $18.00 per hour, damages thus approximate $1053.00.

92. In 2010, Defendants failed to pay Santa Lucia for approximately 58.5 hours of post-trip inspections that he worked. At $18.00 per hour, damages thus approximate $1053.00.

93. In 2010, Defendants failed to properly pay Santa Lucia for approximately 108 hours of overtime. At $26.00 per hour, damages thus approximate $2,808.00.

94. In 2010, Defendants failed to pay Santa Lucia for 8 hours of his paid lunch break during non-prevailing wage jobs. At $18.00 per hour, damages thus approximate $136.00.

95. In 2010, Defendants failed to properly pay Santa Lucia for over 101 shifts of prevailing wage work at $125.00 per shift. This includes the mandatory increase of 15% during work on prevailing wage night jobs, the $2.06 unilateral insurance deduction by McClain, the unilateral deduction for lunch during each shift, and the unpaid hours of prevailing wage work while Santa Lucia remained on site. Damages thus approximate $12,625.00.

96. The total unpaid wages, without factoring liquidated and other damages, during the course of Santa Lucia's employment thus approximate $51,169.67.

97.  At the time of his termination, Santa Lucia was making a salary of $18/hour and should have received compensation at prevailing wages as well as overtime.  Further, Plaintiff received medical insurance, dental insurance, vision insurance, etc.  In 2009, Defendants paid Santa Lucia $56,638.50 in wages.  Santa Lucia estimates that he should have received in excess of $80,000 in wages if Defendants followed their legal obligations.

98. These benefits of employment make up Plaintiff's claim for damages.

### *Frank Bruno*

99.  Bruno began working for McClain as a TCT in or around December 8, 2007.

100. During his employment at McClain, Bruno's base salary was $17.00 per hour.

101. During the relevant time, Bruno worked on several state government contracts in New York and New Jersey.

102. Due in large part to Bruno's previous experience and his possession of a commercial driver's license ("CDL") he also was hired to serve as a team leader/operator.

103. McClain company policy, at the time, mandated that employees who possessed a CDL would receive additional compensation due to the fact that the employee possessed a CDL.

104. Despite this contractual obligation, Bruno never received additional pay for the possession of a CDL.

105. Every TCT, including Bruno, were required to show up a half hour before their shift began, for a pre-trip inspection which included checking the truck fluids, loading the truck, and generally, preparing for the job.

106. Additionally, each TCT, including Bruno, was required to work a half hour after their shift ended, for a post-trip inspection which included unloading and checking the truck.

107. Defendants failed to pay Bruno his wages for this pre-trip inspection or post-trip inspection.

108. Additionally, Defendants failed to pay Bruno for his lunch hour, overtime, and appropriate wages.

109. For example, despite the fact that Bruno would often work twelve hour days, Defendants would pay Bruno for only seven or eight hours of work.

110. Plaintiffs had discussions throughout their employment wherein they protested the illegal actions of Defendants.

111. Defendants' actions to violate the wage laws were intentional as demonstrated by a 2009 memorandum.

112. In approximately March 2009, Defendants posted a memorandum detailing an illegal compensation plan for employees.

113. The memorandum indicated the pay for work on state government contracts, during the day, inside the five boroughs of New York City, would be four hours at prevailing wage, and three hours at base pay.

114. The memorandum indicated the pay for work on state government contracts, during night hours, within the five boroughs of New York City, would be five hours at prevailing wage, and three hours at base pay.

115. The memorandum indicated the pay for work on state government contracts inside of Suffolk and Nassau Counties, would be five hours at prevailing wage, and three hours at base pay.

116. The memorandum indicated the pay for work on state government contracts inside Westchester County would be hourly base pay minus a half hour for lunch.

117. Bruno and other employees objected to signing the memorandum as it did not comport with the prevailing wage law and it was not consistent with the realities of his work day.

118. Despite this, all employees, including Bruno, were informed that if they did not sign the memorandum, they would not be allowed to continue working.

119. In August 2010, Bruno and other employees continued their complaints about the Defendants' failure to pay proper wages.

120. Bruno had discussions with Ladd and other managers who refused to take curative action and engaged in numerous actions to demean and marginalize Bruno and the other employees.

121. Ladd's lack of respect for employees of McClain was further demonstrated in various memoranda that he distributed for employees.

122. Due to the fact that Defendants engaged in such persistent and consistent intentional wage violations, Plaintiffs decided to contact a union representative to seek assistance.

123. Thus, on approximately August 25, 2010, Plaintiffs and other employees met with a representative from the Teamsters, at the Meadowlands Diner in New Jersey, to discuss forming a union at the company.

124. Plaintiffs met with the union representative to discuss the numerous illegal actions occurring at the work place and their objections to these illegal actions.

125. Defendants became aware of this union meeting and decided to take immediate and retaliatory action.

126. The following day, on August 26, 2010, Defendants took Bruno off the work schedule and informed him he was terminated.

127. Defendants' purported reasons for the termination were so obviously pretextual that Bruno grieved the termination through his chain of command.

128. Thus, on approximately September 7, 2010, Bruno met with Ladd to discuss the termination.

129. Ladd admitted that the reason for Bruno's termination had to do with him attending a union meeting.

130. Bruno protested the termination and discussed his earlier objections to the illegal actions of Defendants pertaining to his wages.

131. Despite this, Ladd refused to take curative action and instead aided and abetted in the illegal actions of Defendants in terminating Bruno.

132. Defendants' actions to not pay proper wages were intentional.

133. In 2008, Defendants failed to pay Bruno for approximately 76 hours of pre-trip inspections that he worked. At $17.00 per hour, damages thus approximate $1,292.00.

134. In 2008, Defendants failed to pay Bruno for approximately 76 hours of post-trip inspections that he worked. At $17.00 per hour, damages thus approximate $1,292.00.

135. In 2008, Defendants failed to pay Bruno for approximately 17 hours of overtime that he worked. At $25.50 per hour, damages thus approximate $433.50.

136. In 2008, Defendants failed to pay Bruno for approximately 26 hours of his paid lunch break during his prevailing wage jobs. At $61.01, damages thus approximate $1,586.26.

137. In 2008, Defendants failed to pay Bruno for approximately 28.5 hours of his paid lunch break during his non-prevailing wage jobs. At $17.00, damages approximate $484.50.

138. In 2008, Defendants wrongfully deducted approximately 39.5 hours of wages at $2.06/hour for insurance costs. Thus, damages approximate $81.37.

139. Thus, total unpaid wages, without factoring liquidated and other damages for 2008 approximates $9,071.13.

140. In 2009, Defendants failed to pay Bruno for approximately 111 hours of pre-trip inspections that he worked. At $17.00 per hour, damages thus approximate $1,887.00.

141. In 2009, Defendants failed to pay Bruno for approximately 111 hours of post-trip inspections that he worked. At $17.00 per hour, damages thus approximate $1,887.00.

142. In 2009, Defendants failed to pay Bruno for approximately 108 hours of overtime that he worked. At $25.50 per hour, damages thus approximate $2,754.00.

143. In 2009, Defendants failed to pay Bruno for 21.5 hours of his paid lunch break during non-prevailing wage jobs. At $17.00 per hour, damages thus approximate $365.50.

144. In 2009, Defendants failed to properly pay Bruno for over 172 shifts of prevailing wage work at $125.00 per shift. This includes the mandatory increase of 15% during work on prevailing wage night jobs, the $2.06 unilateral insurance deduction by the Company, the unilateral deduction for lunch during each shift, and the unpaid hours of prevailing wage work while Bruno remained on site. Damages thus approximate $21,500.

145. Thus, total unpaid wages, without factoring liquidated and other damages for 2009 approximates $28,393.50.

146. In 2010, Defendants failed to pay Bruno for approximately 58.5 hours of pre-trip inspections that he worked. At $17.00 per hour, damages thus approximate $994.50.

147. In 2010, Defendants failed to pay Bruno for approximately 58.5 hours of post-trip inspections that he worked. At $17.00 per hour, damages thus approximate $994.50.

148. In 2010, Defendants failed to properly pay Bruno for approximately 108 hours of overtime. At $25.50 per hour, damages thus approximate $2,754.00.

149. In 2010, Defendants failed to pay Bruno for 8 hours of his paid lunch break during non-prevailing wage jobs. At $17.00 per hour, damages thus approximate $136.00.

150. In 2010, Defendants failed to properly pay Bruno for over 111 shifts of prevailing wage work at $125.00 per shift. This includes the mandatory increase of 15% during work on prevailing wage night jobs, the $2.06 unilateral insurance deduction by the Company, the unilateral deduction for lunch during each shift, and the unpaid hours

of prevailing wage work while Bruno remained on site. Damages thus approximate $13,875.

151. The total unpaid wages, without factoring liquidated and other damages, during the course of Bruno's employment thus approximate $40,409.16

152. At the time of his termination, on August 26, 2010, Bruno was making a salary of $17/hour and should have received compensation at prevailing wages as well as overtime. Further, Plaintiff received medical insurance, dental insurance, vision insurance, etc. In 2009, Defendants paid Bruno an annual base salary of $56,638.50. Bruno estimates that if Defendants were paying him his proper wages, he should have received in excess of $75,000 as his annual base salary in 2009.

153. These benefits of employment make up Plaintiff's claim for damages.

### ***Ivan Casiano***

154. Casiano began working for McClain as a TCT in or around March 10, 2009.

155. During his employment at McClain, Casiano's base salary was $16.00 per hour.

156. During the relevant time, McClain had several contracts with New York and New Jersey State government.

157. Casiano worked as a TCT on many of these State Government contracts throughout New York and New Jersey.

158. Due in large part to Casiano's previous experience and his possession of a CDL he also was hired to serve as a team leader/operator.

159. McClain company policy, at the time mandated that employees who possessed a CDL would receive additional compensation due to the fact that the employee possessed a CDL.

160. Despite this contractual obligation, Casiano never received additional compensation for possessing a CDL.

161. Each TCT, including Casiano, were required to show up a half hour before their shift began, for a pre-trip inspection which included the checking of fluids, loading the truck, and generally, preparing for the job.

162. Additionally, each TCT, including Casiano, were required to work a half hour after their shift ended, for a post-trip inspection which included unloading and checking the truck.

163. Defendants failed to pay Casiano for this pre-trip or post-trip inspection.

164. Additionally, Defendants failed to pay Casiano for his lunch hour, overtime, and appropriate wages.

165. For example, despite the fact that Casiano would often work twelve hour days, Defendants would pay Casiano for only seven or eight hours of work.

166. Plaintiffs had discussions throughout their employment wherein they protested the illegal actions of Defendants.

167. Defendants' actions to violate the wage laws were intentional as demonstrated by a March 2009 memorandum.

168. In approximately March 2009, Defendants posted a memorandum detailing an illegal compensation plan for employees.

169. The memorandum indicated the pay for work on state government contracts, during the day, inside the five boroughs of New York City, would be four hours at prevailing wage, and three hours at base pay.

170. The memorandum indicated the pay for work on state government contracts, during night hours, within the five boroughs of New York City, would be five hours at prevailing wage, and three hours at base pay.

171. The memorandum indicated the pay for work on state government contracts inside of Suffolk and Nassau Counties, would be five hours at prevailing wage, and three hours at base pay.

172. The memorandum indicated the pay for work on state government contracts inside Westchester County would be hourly base pay minus a half hour for lunch.

173. Casiano and other employees objected to signing the memo as it did not comport with the prevailing wage law and it was not consistent with the realities of his work day.

174. Despite this, all employees, including Casiano, were informed that if they did not sign the memorandum, they would not be allowed to continue working.

175. In August 2010, Casiano and other employees continued their complaints about the Defendants failure to pay proper wages.

176. Casiano had numerous discussions with Ladd and other managers who refused to take curative action and engaged in numerous actions to demean and marginalize Casiano and other employees.

177. Ladd's lack of respect for employees at McClain was further demonstrated in various memoranda he distributed to employees.

178. Due to the fact that the Defendants engaged in such persistent and consistent intentional wage violations, Plaintiffs decided to contact a union representative to seek assistance.

179. Thus, on approximately August 25, 2010, Plaintiffs and other employees met with a representative from the Teamsters, at the Meadowlands Diner in New Jersey, to discuss forming a union at the company.

180. Plaintiffs met with the union representative to discuss the numerous illegal actions occurring at the work place and their objections to these illegal actions.

181. Defendants became aware of this union meeting and decided to take immediate and retaliatory action.

182. The following day, on August 26, 2010, Defendants took Casiano off the work schedule and informed him he was terminated.

183. Defendants purported reasons for termination were so obviously pretextual for his whistleblowing activities and protected act of attending the union meeting, that Casiano grieved the termination through his chain of command.

184. Defendants' actions to not pay proper wages were intentional.

185. In 2009, Defendants failed to pay Casiano for approximately 90 hours of pre-trip inspections that he worked. At $17.00 per hour, damages thus approximate $1,530.00.

186. In 2009, Defendants failed to pay Casiano for approximately 90 hours of post-trip inspections that he worked. At $17.00 per hour, damages thus approximate $1,530.00.

187. In 2009, Defendants failed to pay Casiano for approximately 90 hours of his paid lunch break during his non-prevailing wage jobs. At $17.00, damages approximate $1,530.00.

188. In 2009, Defendants failed to pay Casiano for approximately 144 hours of overtime that he worked. At $25.50 per hour, damages thus approximate $3,672.00.

189. In 2009, Defendants failed to properly pay Casiano for over 143 shifts of prevailing wage work at $125.00 per hour. This includes the mandatory increase of 15% during work on prevailing wage night jobs, the $2.06 unilateral insurance deduction by the Company, the unilateral deduction for lunch during each shift, and the unpaid hours of prevailing wage work while Bruno remained on site. Damages thus approximate $17,875.00.

190. Thus, total unpaid wages, without factoring liquidated and other damages for 2009 approximates $21,547.00.

191. In 2010, Defendants failed to pay Casiano for approximately 10 hours of pre-trip inspections that he worked. At $17.00 per hour, damages thus approximate $170.00.

192. In 2010, Defendants failed to pay Casiano for approximately 10 hours of post-trip inspections that he worked. At $17.00 per hour, damages thus approximate $170.00.

193. In 2010, Defendants failed to pay Casiano for approximately 16 hours of overtime that he worked. At $25.50 per hour, damages thus approximate $408.00.

194. In 2010, Defendants failed to pay Casiano for 30 hours of his paid lunch break during non-prevailing wage jobs. At $17.00 per hour, damages thus approximate $510.00.

195. In 2010, Defendants failed to properly pay Casiano for over 20 shifts of prevailing wage work at $125.00 per shift. This includes the mandatory increase of 15% during work on prevailing wage night jobs, the $2.06 unilateral insurance deduction by the Company, the unilateral deduction for lunch during each shift, and the unpaid hours of prevailing wage work while Bruno remained on site. Damages thus approximate $2,500.

196. Thus, total unpaid wages, without factoring liquidated and other damages during the course of Casiano's employment approximate $24,047.00.

197. At the time of his termination, on August 26, 2010, Casiano was making a salary of $17/hour and should have received compensation at prevailing wages as well as overtime. Further, Plaintiff received medical insurance, dental insurance, vision insurance, etc. In 2009, Defendants paid Casiano an annual base salary of $43,894.51. Casiano estimates that if Defendants were paying him his proper wages, he should have received in excess of $60,000 as his annual base salary in 2009.

198. These benefits of employment make up Plaintiff's claim for damages.

### *Danny Brattoli*

199. Brattoli began working for McClain as a TCT in or around April 2009.

200. During his employment at McClain, Brattoli's base salary was $16.00 per hour.

201. During the relevant time, McClain had several contracts with New York and New Jersey State government.

202. Brattoli worked as a TCT on many of these state government contracts throughout New York and New Jersey.

203. Every TCT, including Brattoli, was required to show up a half hour before their shift began, for a pre-trip inspection, which included checking the truck fluids, loading the truck, and generally, preparing for the job.

204. Additionally, each TCT, including Brattoli, were required to work a half hour after their shift ended, for a post-trip inspection which included unloading and checking the truck.

205. Defendants failed to pay Brattoli his wages for this pre-trip and post-trip inspection.

206. Additionally, Defendants failed to pay Brattoli for his lunch hour, overtime, and appropriate wages.

207. For example, despite the fact that Brattoli would often work twelve hour days, Defendants would pay Brattoli for only seven or eight hours of work.

208. Plaintiff had repeated discussions with his supervisors throughout his employment wherein he complained and protested the illegal actions of Defendants.

209. Defendants' actions to violate the wage laws were intentional as demonstrated by a March 2009 memorandum.

210. In approximately March 2009, Defendants posted a memorandum detailing an illegal compensation plan for employees.

211. The memorandum indicated the pay for work on state government contracts, during the day, inside the five boroughs of New York City, would be four hours at prevailing wage, and three hours at base pay.

212. The memorandum indicated the pay for work on state government contracts, during night hours, within the five boroughs of New York City, would be five hours at prevailing wage, and three hours at base pay.

213. The memorandum indicated the pay for work on state government contracts inside of Suffolk and Nassau Counties, would be five hours at prevailing wage, and three hours at base pay.

214. The memorandum indicated the pay for work on state government contracts inside Westchester County would be hourly base pay minus a half hour for lunch.

215. Brattoli and other employees objected to signing the memorandum as it did not comport with the prevailing wage law and it was not consistent with the realities of his work day.

216. Despite this, all employees, including Brattoli, were informed that if they did not sign the memorandum, they would not be allowed to continue working.

217. In August 2010, Brattoli and other employees continued their complaints to their supervisors about the Defendants failure to pay proper wages.

218. Brattoli had discussions and other managers who refused to take curative action and engaged in numerous actions to demean and marginalize Brattoli and other employees.

219. Ladd's lack of respect for employees of McClain was further demonstrated in various memoranda that he distributed for employees.

220. Due to the fact that employees engaged in such persistent and consistent intentional wage violations, Plaintiffs decided to contact a union representative to seek assistance and legal protection.

221. Thus, on approximately August 25, 2010, Plaintiffs and other employees met with a representative from the Teamsters, at the Meadowlands Diner in New Jersey, to discuss forming a union at the company.

222. Plaintiffs met with the union representative to discuss the numerous illegal actions occurring at the work place and their objections to these illegal actions.

223. Defendants became aware of this union meeting and decided to take immediate and retaliatory action.

224. The following day, on August 26, 2010, Defendants took Brattoli off the schedule and informed him he was terminated.

225. Defendants' purported reasons for the termination were so obviously pretextual for his whistleblowing activities and protected act of attending the union meeting, that Brattoli grieved the termination through his chain of command.

226. Brattoli protested the termination and discussed his earlier objections to the illegal actions of Defendants pertaining to his wages.

227. At the time of his termination, Brattoli was making a base pay of $16.00 an hour in addition to the contingent prevailing wage stipulated by the McClain company memorandum he signed at the outset of his employment.

228. In 2009, Defendants failed to pay Brattoli for approximately 70 hours of pre-trip inspections that he worked. At $16.00 per hour, damages thus approximate $1,120.00.

229. In 2009, Defendants failed to pay Brattoli for approximately 70 hours of post-trip inspections that he worked. At $16.00 per hour, damages thus approximate $1,120.00.

230. In 2009, Defendants failed to pay Brattoli for approximately 50 hours of overtime that he worked. At $24.00 per hour, damages thus approximate $1,200.00.

231. In 2009, Defendants failed to pay Brattoli for 70 hours of his paid lunch break during non-prevailing wage jobs. At $16.00 per hour, damages thus approximate $1,120.00.

232. In 2009, Defendants failed to properly pay Brattoli for over 90 shifts of prevailing wage work at $125.00 per shift. This includes the mandatory increase of 15% during work on prevailing wage night jobs, the $2.06 unilateral insurance deduction by the Company, the unilateral deduction for lunch during each shift, and the unpaid hours of prevailing wage work while Bruno remained on site. Damages thus approximate $11,250.00.

233. Thus, total unpaid wages, without factoring liquidated and other damages for 2009 approximate $15,810.00.

234. In 2010, Defendants failed to pay Brattoli for approximately 43 hours of pre-trip inspections that he worked. At $16.00 per hour, damages thus approximate $688.00.

235. In 2010, Defendants failed to pay Brattoli for approximately 43 hours of post-trip inspections that he worked. At $16.00 per hour, damages thus approximate $688.00.

236. In 2010, Defendants failed to pay Brattoli for approximately 30 hours of overtime that he worked. At $24.00 per hour, damages thus approximate $720.00.

237. In 2010, Defendants failed to pay Brattoli for 43 hours of his paid lunch break during non-prevailing wage jobs. At $16.00 per hour, damages thus approximate $688.00.

238. In 2010, Defendants failed to properly pay Brattoli for over 65 shifts of prevailing wage work at $125.00 per shift. This includes the mandatory increase of 15% during work on prevailing wage night jobs, the $2.06 unilateral insurance deduction by the Company, the unilateral deduction for lunch during each shift, and the unpaid hours of prevailing wage work while Brattoli remained on site. Damages thus approximate $8.125.00.

239. Thus, total unpaid wages, without factoring liquidated and other damages for during the course of Brattoli's employment approximate $26,719.00.

240. At the time of his termination, on August 26, 2010, Brattoli was making a salary of $16/hour and should have received compensation at prevailing wages as well as overtime. Further, Plaintiff received medical insurance, dental insurance, vision insurance, etc. In 2009, Defendants paid Brattoli an annual base salary of approximately $40,000. Brattoli estimates that if Defendants were paying him his proper wages, he should have received in excess of $60,000 as his annual base salary in 2009.

241. These benefits of employment make up Plaintiff's claim for damages.

### *Joseph Tritto*

242. Tritto began working for McClain & Company as a TCT in or around April 2008.

243. During his employment at the Company, Tritto's base salary was $17.00 per hour.

244. During the relevant time, the Company had several contracts with New York and New Jersey State Government.

245. Tritto worked as a TCT on many of these state government contracts throughout New York and New Jersey.

246. Every TCT, including Tritto, was required to show up a half hour before their shift began, for a pre-trip inspection which included checking the truck fluids, loading the truck, and generally, preparing for the job.

247. Additionally, each TCT, including Tritto, were required to work a half hour after their shift ended, for a post-trip inspection which included unloading and checking the truck.

248. Defendants failed to pay Tritto his wages for this pre-trip and post-trip inspection.

249. Additionally, Defendants failed to pay Tritto for his lunch hour, overtime, and appropriate wages.

250. For example, despite the fact that Tritto would often work twelve hour days, Defendants would pay Tritto for only seven or eight hours of work.

251. Plaintiffs had discussions throughout their employment wherein they protested the illegal actions of Defendants.

252. Defendants' actions to violate the wage laws were intentional as demonstrated by a March 2009 memorandum.

253. In approximately March 2009, Defendants posted a memorandum detailing an illegal compensation plan for employees.

254. The memorandum indicated the pay for work on state government contracts, during the day, inside the five boroughs of New York City, would be four hours at prevailing wage, and three hours at base pay.

255. The memorandum indicated the pay for work on state government contracts, during night hours, within the five boroughs of New York City, would be five hours at prevailing wage, and three hours at base pay.

256. The memorandum indicated the pay for work on state government contracts inside of Suffolk and Nassau Counties, would be five hours at prevailing wage, and three hours at base pay.

257. The memorandum indicated the pay for work on state government contracts inside Westchester County would be hourly base pay minus a half hour for lunch.

258. Various employees objected to signing the memorandum as it did not comport with the prevailing wage law and it was not consistent with the realities of their work day.

259. Tritto had discussions with his managers, such as Carucci, who refused to take curative action and engaged in numerous actions to demean and marginalize Tritto and the other employees.

260. Due to Plaintiff's repeated complaints to his supervisors regarding the illegal conduct at McClain & Co., Plaintiff was terminated by Defendants in or around December 2009.

261. Thereafter, Tritto filed for unemployment.

262. Tritto filed for unemployment, despite knowing that Carucci had made it abundantly clear that if employees filed for unemployment, they would be retaliated against and never called back for work.

263. However, Tritto had no other income and needed to file for unemployment as he could find no other employment.

264. Defendants' actions to not pay proper wages were intentional.

265. In 2008, Defendants failed to pay Tritto for approximately 17 hours of pre-trip inspections that he worked. At $17.00 per hour, damages thus approximate $289.00.

266. In 2008, Defendants failed to pay Tritto for approximately 17 hours of post-trip inspections that he worked. At $17.00 per hour, damages thus approximate $289.00

267. In 2008, Defendants failed to pay Tritto for approximately 4.5 hours of his paid lunch break during his prevailing wage jobs. At $61.01, damages thus approximate $274.50

268. In 2008, Defendants failed to pay Tritto for approximately 12.5 hours of his paid lunch break during his non-prevailing wage jobs. At $17.00, damages approximate $212.50.

269. Thus, total unpaid wages, without factoring liquidated and other damages for 2008 approximates $1,065.04

270. In 2009, Defendants failed to pay Tritto for approximately 72.5 hours of pre-trip inspections that he worked. At $17.00 per hour, damages thus approximate $1,232.50.

271. In 2009, Defendants failed to pay Tritto for approximately 72.5 hours of post-trip inspections that he worked. At $17.00 per hour, damages thus approximate $1,232.50.

272. In 2009, Defendants failed to pay Tritto for approximately 101 hours of overtime that he worked. At $25.50 per hour, damages thus approximate $2,575.50.

273. In 2009, Defendants failed to pay Tritto for 32 hours of his paid lunch break during non-prevailing wage jobs. At $17.00 per hour, damages thus approximate $544.00.

274. In 2009, Defendants failed to properly pay Tritto for over 80 shifts of prevailing wage work at $125.00 per shift. This includes the mandatory increase of 15% during work on prevailing wage night jobs, the $2.06 unilateral insurance deduction by the Company, the unilateral deduction for lunch during each shift, and the unpaid hours of prevailing wage work while Tritto remained on site. Damages thus approximate $10,000.

275. Thus, total unpaid wages, without factoring liquidated and other damages during the course of Tritto's employment approximate $16,717.48.

276. At the time of his termination, in or around December 2009, Tritto was making a salary of $17/hour and should have received compensation at prevailing wages as well as overtime. Further, Plaintiff received medical insurance, dental insurance, vision insurance, etc. In 2009, Defendants paid Tritto an annual base salary of $35,808.24. Tritto estimates that if Defendants were paying him his proper wages, he should have received in excess of $50,000 as his annual base salary in 2009.

277. These benefits of employment make up Plaintiff's claim for damages.

### *Gabriel Scianna*

278. Scianna began working for McClain as a TCT in or around August 15, 2008.

279. During his employment at McClain, Scianna's base salary was $17.00 per hour.

280. During the relevant time, Scianna worked on several state government contracts in New York and New Jersey.

281. Every TCT, including Scianna, were required to show up a half hour before their shift began, for a pre-trip inspection which included checking the truck fluids, loading the truck, and generally, preparing for the job.

282. Additionally, each TCT, including Scianna, were required to work a half hour after their shift ended, for a post-trip inspection which included unloading and checking the truck.

283. Defendants failed to pay Scianna his wages for this pre-trip inspection or post-trip inspection.

284. Additionally, Defendants failed to pay Scianna for his lunch hour, overtime, and appropriate wages.

285. For example, despite the fact that Scianna would often work twelve hour days, Defendants would pay Scianna for only seven or eight hours of work.

286. Plaintiffs had discussions throughout their employment wherein they protested the illegal actions of Defendants.

287. Defendants' actions to violate the wage laws were intentional as demonstrated by a 2009 memorandum.

288. In approximately March 2009, Defendants posted a memorandum detailing an illegal compensation plan for employees.

289. The memorandum indicated the pay for work on state government contracts, during the day, inside the five boroughs of New York City, would be four hours at prevailing wage, and three hours at base pay.

290. The memorandum indicated the pay for work on state government contracts, during night hours, within the five boroughs of New York City, would be five hours at prevailing wage, and three hours at base pay.

291. The memorandum indicated the pay for work on state government contracts inside of Suffolk and Nassau Counties, would be five hours at prevailing wage, and three hours at base pay.

292. The memorandum indicated the pay for work on state government contracts inside Westchester County would be hourly base pay minus a half hour for lunch.

293. Scianna and other employees objected to signing the memorandum as it did not comport with the prevailing wage law and it was not consistent with the realities of his work day.

294. Despite this, all employees, including Scianna, were informed that if they did not sign the memorandum, they would not be allowed to continue working.

295. In August 2010, Scianna and other employees continued their complaints to their supervisors about the Defendants' failure to pay proper wages.

296. Scianna had discussions with Ladd and other managers, such as Ferrer and Carucci, who refused to take curative action and engaged in numerous actions to demean and marginalize Scianna and the other employees.

297. Thus, due to Scianna's repeated complaints of illegal activity at McClain & Co., Scianna was fired from McClain & Co.

298. Defendants' actions to not pay proper wages were intentional.

299. In 2008, Defendants failed to pay Scianna for approximately 23 hours of pre-trip inspections that he worked. At $16.00 per hour, damages thus approximate $368.00.

300. In 2008, Defendants failed to pay Scianna for approximately 23 hours of post-trip inspections that he worked. At $17.00 per hour, damages thus approximate $368.00.

301. In 2008, Defendants failed to pay Scianna for approximately 5 hours of overtime that he worked. At $24.00 per hour, damages thus approximate $120.00.

302. In 2008, Defendants failed to pay Scianna for approximately 7 hours of his paid lunch break during his prevailing wage jobs. At $61.01, damages thus approximate $427.07.

303. In 2008, Defendants failed to pay Scianna for approximately 12 hours of his paid lunch break during his non-prevailing wage jobs. At $16.00, damages approximate $192.00.

304. Thus, total unpaid wages, without factoring liquidated and other damages for 2008 approximates $1,475.07.

305. In 2009, Defendants failed to pay Scianna for approximately 87.5 hours of pre-trip inspections that he worked. At $17.00 per hour, damages thus approximate $1,487.50.

306. In 2009, Defendants failed to pay Scianna for approximately 87.5 hours of post-trip inspections that he worked. At $17.00 per hour, damages thus approximate $1,487.50.

307. In 2009, Defendants failed to pay Scianna for approximately 80 hours of overtime that he worked. At $25.50 per hour, damages thus approximate $2,040.00.

308. In 2009, Defendants failed to pay Scianna for 63 hours of his paid lunch break during non-prevailing wage jobs. At $17.00 per hour, damages thus approximate $1,071.00.

309. In 2009, Defendants failed to properly pay Scianna for over 112 shifts of prevailing wage work at $125.00 per shift. This includes the mandatory increase of 15% during work on prevailing wage night jobs, the $2.06 unilateral insurance deduction by the Company, the unilateral deduction for lunch during each shift, and the unpaid hours of prevailing wage work while Scianna remained on site. Damages thus approximate $14,000.

310. Thus, total unpaid wages, without factoring liquidated and other damages for 2009 approximates $20,086.00.

311. In 2010, Defendants failed to pay Scianna for approximately 63 hours of pre-trip inspections that he worked. At $17.00 per hour, damages thus approximate $1,071.00.

312. In 2010, Defendants failed to pay Scianna for approximately 63 hours of post-trip inspections that he worked. At $17.00 per hour, damages thus approximate $1,071.00.

313. In 2010, Defendants failed to properly pay Scianna for approximately 54 hours of overtime. At $25.50 per hour, damages thus approximate $1,377.00.

314. In 2010, Defendants failed to pay Scianna for 13 hours of his paid lunch break during non-prevailing wage jobs. At $17.00 per hour, damages thus approximate $221.00.

315. In 2010, Defendants failed to properly pay Scianna for over 87.5 shifts of prevailing wage work at $125.00 per shift. This includes the mandatory increase of 15% during work on prevailing wage night jobs, the $2.06 unilateral insurance deduction by the Company, the unilateral deduction for lunch during each shift, and the unpaid hours of prevailing wage work while Scianna remained on site. Damages thus approximate $10,937.50.

316. The total unpaid wages, without factoring liquidated and other damages, during the course of Scianna's employment thus approximate $36,238.07.

317. At the time of his termination, Scianna was making a salary of $17/hour and should have received compensation at prevailing wages as well as overtime. Further, Plaintiff received medical insurance, dental insurance, vision insurance, etc. In 2009, Defendants paid Scianna an annual base salary of approximately $50,000. Scianna estimates that if Defendants were paying him his proper wages, he should have received in excess of $70,000 as his annual base salary in 2010.

318. These benefits of employment make up Plaintiff's claim for damages.

### ***Dwayne Webster***

319. Webster began working for McClain as a TCT in or around October 10, 2008.

320. Initially, Webster's base salary was $16.00 per hour.

321. Several months into his employment at McClain, Webster began receiving $17.00 per hour.

322. During the relevant time, Webster worked on several state government contracts in New York and New Jersey.

323. Every TCT, including Webster, were required to show up a half hour before their shift began, for a pre-trip inspection which included checking the truck fluids, loading the truck, and generally, preparing for the job.

324. Additionally, each TCT, including Webster, were required to work a half hour after their shift ended, for a post-trip inspection which included unloading and checking the truck.

325. Defendants failed to pay Webster his wages for this pre-trip inspection or post-trip inspection.

326. Additionally, Defendants failed to pay Webster for his lunch hour, overtime, and appropriate wages.

327. For example, despite the fact that Webster would often work twelve hour days, Defendants would pay Webster for only seven or eight hours of work.

328. Plaintiffs had discussions throughout their employment wherein they protested the illegal actions of Defendants.

329. Defendants' actions to violate the wage laws were intentional as demonstrated by a 2009 memorandum.

330. In approximately March 2009, Defendants posted a memorandum detailing an illegal compensation plan for employees.

331. The memorandum indicated the pay for work on state government contracts, during the day, inside the five boroughs of New York City, would be four hours at prevailing wage, and three hours at base pay.

332. The memorandum indicated the pay for work on state government contracts, during night hours, within the five boroughs of New York City, would be five hours at prevailing wage, and three hours at base pay.

333. The memorandum indicated the pay for work on state government contracts inside of Suffolk and Nassau Counties, would be five hours at prevailing wage, and three hours at base pay.

334. The memorandum indicated the pay for work on state government contracts inside Westchester County would be hourly base pay minus a half hour for lunch.

335. Webster and other employees objected to signing the memorandum as it did not comport with the prevailing wage law and it was not consistent with the realities of his work day.

336. Despite this, all employees, including Webster, were informed that if they did not sign the memorandum, they would not be allowed to continue working.

337. In August 2010, Webster and other employees continued their repeated complaints to their supervisors about the Defendants' failure to pay proper wages.

338. Webster had discussions with supervisors Ladd and other managers, such as Carucci, who refused to take curative action and engaged in numerous actions to demean and marginalize Webster and the other employees.

339. Thus, due to Webster's repeated complaints he was illegally terminated from McClain & Co. and never asked back to work.

340. Defendants' actions to not pay proper wages were intentional.

341. In 2009, Defendants failed to pay Webster for approximately 233 hours of pre-trip inspections that he worked. At $17.00 per hour, damages thus approximate $3,961.00.

342. In 2009, Defendants failed to pay Webster for approximately 233 hours of post-trip inspections that he worked. At $17.00 per hour, damages thus approximate $3,961.00.

343. In 2009, Defendants failed to pay Webster for approximately 90 hours of overtime that he worked. At $25.50 per hour, damages thus approximate $2,295.00.

344. In 2009, Defendants failed to pay Webster for 116.5 hours of paid lunch break during non-prevailing wage jobs. At $17.00 per hour, damages thus approximate $1,981.00

345. In 2009, Defendants failed to properly pay Webster for over 144 shifts of prevailing wage work at $125.00 per shift. This includes the mandatory increase of 15% during work on prevailing wage night jobs, the $2.06 unilateral insurance deduction by the Company, the unilateral deduction for lunch during each shift, and the unpaid hours of prevailing wage work while Webster remained on site. Damages thus approximate $18,000.

346. Thus, total unpaid wages, without factoring liquidated and other damages for 2009 approximates $30,198.00.

347. In 2010, Defendants failed to pay Webster for approximately 99 hours of pre-trip inspections that he worked. At $17.00 per hour, damages thus approximate $1,683.00.

348. In 2010, Defendants failed to pay Webster for approximately 99 hours of post-trip inspections that he worked. At $17.00 per hour, damages thus approximate $1,683.00.

349. In 2010, Defendants failed to properly pay Webster for approximately 99 hours of overtime. At $25.50 per hour, damages thus approximate $2,525.00.

350. In 2010, Defendants failed to pay Webster for 49.5 hours of his paid lunch break during non-prevailing wage jobs. At $17.00 per hour, damages thus approximate $841.50.

351. In 2010, Defendants failed to properly pay Webster for over 86 shifts of prevailing wage work at $125.00 per shift. This includes the mandatory increase of 15% during work on prevailing wage night jobs, the $2.06 unilateral insurance deduction by the Company, the unilateral deduction for lunch during each shift, and the unpaid hours of prevailing wage work while Webster remained on site. Damages thus approximate $10,750.00.

352. The total unpaid wages, without factoring liquidated and other damages, during the course of Webster's employment thus approximate $47,680.50.

353. At the time of his termination, Webster was making a salary of $17/hour and should have received compensation at prevailing wages as well as overtime. Further, Plaintiff received medical insurance, dental insurance, vision insurance, etc. In 2009, Defendants paid Webster an annual base salary of approximately $57,974.85. Webster estimates that if Defendants were paying him his proper wages, he should have received in excess of $80,000 as his annual base salary in 2009.

354. These benefits of employment make up Plaintiff's claim for damages.

## Count I
### (New Jersey Wage and Hour Law, N.J.S.A. 34:11-56a *et seq.*)

355. Plaintiffs reallege and incorporate herein the paragraphs set forth in this Complaint.

356. The actions of Defendants give rise to a violation of the New Jersey Wage and Hour Law and the evidence and actions of all individual Defendants demonstrates an intentional, wilful and deliberate violation of the foregoing statutes set forth in the Complaint.

357. During Defendant Dan McClain's deposition, Dan McClain testified that in April 2009, in his capacity as President and Owner of McClain & Co., he authorized the implementation of an illegal payment policy in which employees would not get paid their exact amount of hours worked on prevailing wage jobs. Despite knowing the policy was illegal, Dan McClain testified that he allowed the policy to continue until May 2010, almost a year and a half after he implemented the illegal scheme.

358. Further, the evidence demonstrates that Dan McClain was aware of complaints from Under Bridge Inspection drivers ("UB drivers") regarding the illegal pay scheme.

Despite his knowledge of such objections, Dan McClain did not discontinue the illegal policy. Instead, Dan McClain ordered Defendant Carucci to continue the policy with regard to the TCTs, including all Plaintiffs, but to make UB drivers an exception to the pay scheme. This testimony demonstrates Dan McClain's further knowledge of the illegal violations, and his active participation, wilfulness, and control over same. Moreover, this evidence was corroborated during the depositions of Carucci, former Supervisor/Project Manager Mike Fallon, Supervisor/Regional Manager Matt Pasquale, Supervisor Al Ladd, and all Plaintiffs in this case.

359. As a direct and proximate result of the actions of Defendants, Plaintiffs have suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries and/or physical injury. Furthermore, Plaintiffs have suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life. Moreover, Plaintiffs have and/or may have to incur expenses for medical, psychiatric, and/or psychological counselling and care. Plaintiff's damages have been experienced in the past, and they will continue into the future.

360. Further, Plaintiffs have been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

## Count II

### (New Jersey Wage Payment Act, N.J.S.A. 34:11-4.1, *et seq.*)

361. Plaintiffs reallege and incorporate herein the paragraphs set forth in this Complaint.

362. The actions of Defendants give rise to a violation of the New Jersey Wage Payment Act. and the evidence and actions of all individual Defendants demonstrates an intentional, wilful and deliberate violation of the foregoing statutes set forth in the Complaint.

363. During Defendant McClain's deposition, Dan McClain testified that in April 2009, in his capacity as President and Owner of McClain & Co., he authorized the implementation of an illegal payment policy in which employees would not get paid their exact amount of hours worked on prevailing wage jobs. Despite knowing the policy was illegal, Dan McClain testified that he allowed the policy to continue until May 2010, almost a year and a half after he implemented the illegal scheme. Further, the evidence demonstrates that Dan McClain was aware of complaints from Under Bridge Inspection drivers ("UB drivers") regarding the illegal pay scheme. Despite his knowledge of such objections, Dan McClain did not discontinue the illegal policy.

Instead, Dan McClain ordered Defendant Carucci to continue the policy with regard to the TCT's, including all Plaintiffs, but to make UB drivers an exception to the pay scheme. This testimony demonstrates Dan McClain's further knowledge of the illegal violations, and his active participation, wilfulness, and control over same. Moreover, this evidence was corroborated during the depositions of Defendant Carucci, former Supervisor/Project Manager Mike Fallon, Supervisor/Regional Manager Matt Pasquale, Supervisor Al Ladd, and all Plaintiffs in this case.

364. As a direct and proximate result of the actions of Defendants, Plaintiffs have suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries and/or physical injury. Furthermore, Plaintiffs have suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life. Moreover, Plaintiffs have and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling and care. Plaintiff's damages have been experienced in the past, and they will continue into the future.

365. Further, Plaintiffs have been required to retain an attorney to assist Plaintiffs in asserting Plaintiff's claims and protecting Plaintiff's rights.

## Count III

### (Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201, *et seq.*)

366. Plaintiffs reallege and incorporate herein the paragraphs set forth in this Complaint.

367. Plaintiffs reallege and incorporate herein the above paragraphs.

368. The actions of Defendants give rise to a violation of the FLSA, and the evidence and actions of all individual Defendants demonstrates an intentional, wilful and deliberate violation of the foregoing statutes set forth in the Complaint.

369. During Defendant McClain's deposition, Dan McClain testified that in April 2009, in his capacity as President and Owner of McClain & Co., he authorized the implementation of an illegal payment policy in which employees would not get paid their exact amount of hours worked on prevailing wage jobs. Despite knowing the policy was illegal, Dan McClain testified that he allowed the policy to continue until May 2010, almost a year and a half after he implemented the illegal scheme.

370. Further, the evidence demonstrates that Dan McClain was aware of complaints from Under Bridge Inspection drivers ("UB drivers") regarding the illegal pay scheme. Despite his knowledge of such objections, Dan McClain did not discontinue the illegal policy. Instead, Dan McClain ordered Defendant Carucci to continue the

policy with regard to the TCT's, including all Plaintiffs, but to make UB drivers an exception to the pay scheme. This testimony demonstrates Dan McClain's further knowledge of the illegal violations, and his active participation, wilfulness, and control over same. Moreover, this evidence was corroborated during the depositions of Defendant Carucci, former Supervisor/Project Manager Mike Fallon, Supervisor/Regional Manager Matt Pasquale, Supervisor Al Ladd, and all Plaintiffs in this case.

371. As a direct and proximate result of the actions of Defendants, Plaintiffs have suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries and/or physical injury. Furthermore, Plaintiffs have suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life. Moreover, Plaintiffs have and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling and care. Plaintiff's damages have been experienced in the past, and they will continue into the future.

372. Further, Plaintiffs have been required to retain an attorney to assist Plaintiffs in asserting Plaintiff's claims and protecting Plaintiffs' rights.

**Count IV**

**(Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq. ("CEPA"))**

373. Plaintiffs reallege and incorporate herein the paragraphs set forth in this Complaint, unless noted below.

374. Plaintiffs complained to supervisors of Defendants' illegal actions that violated law, regulation, policy or custom and gave them a reasonable opportunity to correct the problem. Defendants refused to correct the problem.

375. Defendants were put on notice that they were in violation of the law, regulation, policy, or custom.

376. Defendants retaliated against Plaintiffs for taking such whistle blower actions by retaliating against and terminating Plaintiffs.

377. The above actions of Defendants demonstrate that they are in violation of CEPA.

378. As a direct and proximate result of the actions of Defendants, Plaintiffs have suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries and/or physical injury. Furthermore, plaintiffs have suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life. Moreover,

Plaintiffs have and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling and care. Plaintiffs' damages have been experienced in the past, and they will continue into the future.

379. Further, Plaintiffs have been required to retain an attorney to assist Plaintiffs in asserting Plaintiff's claims and protecting Plaintiffs' rights.

## Count V

## (Breach of Express Contract)

380. Plaintiffs reallege and incorporate herein the paragraphs set forth in this Complaint.

381. Defendants had contractual obligations to Plaintiffs that were set forth in their oral representations and/or their handbook and other employment documents.

382. Defendants' actions breached the contractual obligations set forth in these documents.

383. Defendants' actions give rise to the claim of breach of express contract.

384. As a direct and proximate result of the actions of Defendants, Plaintiffs have suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries and/or physical injury. Furthermore, Plaintiffs have suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiffs' life. Moreover, Plaintiffs have and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling and care. Plaintiffs' damages have been experienced in the past, and they will continue into the future.

385. Further, Plaintiffs have been required to retain an attorney to assist Plaintiffs in asserting Plaintiffs' claims and protecting Plaintiffs' rights.

## Count VI

## (Breach of Implied Contract)

386. Plaintiffs reallege and incorporate herein the paragraphs set forth in this Complaint.

387. Defendants had contractual obligations to Plaintiffs that were set forth in their oral representations and actions.

388. Defendants' actions breached the contractual obligations set forth in these communications.

389. Defendants' actions give rise to the claim of breach of implied contract.

390. As a direct and proximate result of the actions of Defendants, Plaintiffs have been damaged.

**Count VII**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

391. Plaintiffs reallege and incorporate herein the paragraphs set forth in this Complaint.

392. Defendants had contractual obligations to Plaintiffs as reflected above.

393. Defendants have breached these obligations.

394. Defendants' actions give rise to the claim of breach of the implied covenant of good faith and fair dealing.

395. As a direct and proximate result of the actions of Defendants, Plaintiffs have been damaged.

**WHEREFORE**, as to each and every count, Plaintiffs demand judgment on each and all of these Counts against the Defendants jointly and severally, as follows:

    A.  Compensatory damages of not less than $50,000;

    B.  Damages for lost wages and benefits, back pay, front pay (or reinstatement);

    C.  Damages for humiliation, mental and emotional distress;

    D.  Statutory damages, if applicable;

    E.  Punitive damages and or liquidated damages where permitted by law;

    F.  Attorneys' fees and costs of suit;

    G.  Lawful interest - including pre-judgment interest on lost wages;

    H.  Lawful interest - including pre-judgment interest on any wages not paid in a timely manner; and

    I.  Such other, further and different relief as the Court deems fitting, just and proper.

Plaintiffs hereby reserves the right to amend this Complaint to supplement or modify the factual obligations and claims contained herein, based upon information received from the Defendants, witnesses, experts, and others in the course of discovery in this matter.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 4:35-1(a) and (b), Plaintiffs respectfully demand a trial by jury on all issues in the within action so triable.

**DESIGNATION OF TRIAL COUNSEL**

In accordance with Rule 4:25-4, TY HYDERALLY is hereby designated as trial counsel on behalf of Plaintiffs.

## **R. 4:5-1(b)(2) CERTIFICATION OF NO OTHER ACTIONS OR PARTIES**

I hereby certify that there are no other parties known to me at this time who should be joined as parties to this action.

## **DEMAND FOR PRODUCTION OF INSURANCE AGREEMENTS**

Pursuant to R. 4:10-2(b), demand is hereby made that you disclose to the undersigned whether there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy all or part of a judgment which may be entered in the action or to indemnify or reimburse for payment made to satisfy the judgment.

If so, please attach a copy of each, or in the alternative state, under oath and certification: (A) policy number; (b) name and address of insurer; (c) inception and expiration date; (d) names and addresses of all persons insured thereunder; (e) personal injury limits; (f) property damage limits; and (g) medical payment limits.

DATED: August 29, 2013

**HYDERALLY & ASSOCIATES, P.C.**
***Attorneys for Plaintiff***

**By: s/ Ty Hyderally**
**TY HYDERALLY, Esq.**
***for the Firm***